**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**Eastern Division**

|  |  |
|---|---|
| GARY DOUGLAS, *on behalf of himself and all others similarly situated*,<br><br>               Plaintiff,<br>vs.<br><br>CARE CAPITAL PROPERTIES, RAYMOND J. LEWIS, DOUGLAS CROCKER, JOHN L. WORKMAN, JEFFREY A. MALEHORN, RONALD G. GEARY, DALE ANNE REISS, JOHN S. GATES,<br><br>               Defendants. | Civil Case No.:<br><br>**<u>CLASS ACTION COMPLAINT</u>**<br><br>**<u>DEMAND FOR JURY TRIAL</u>** |

**<u>CLASS ACTION COMPLAINT FOR VIOLATION OF SECTIONS 14(a) AND 20(a) OF
THE SECURITIES EXCHANGE ACT OF 1934</u>**

Plaintiff Gary M. Douglas ("Plaintiff"), on behalf of himself and the proposed Class defined herein, brings this class action suit for violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934. In support of this Class Action Complaint, Plaintiff, by his attorneys, alleges upon information and belief, except for his own acts, which are alleged on knowledge, as follows:

**<u>NATURE OF THE ACTION</u>**

1. Plaintiff brings this action on behalf of himself and the public stockholders of Care Capital Properties Inc. ("CCP" or the "Company") against the Company and CCP's Board of Directors (collectively, the "Board" or the "Individual Defendants," as further defined below) for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Rule 14a-9 promulgated thereunder ("Rule 14a-9").

2. On May 7, 2017, Sabra Health Care REIT, Inc., ("Sabra") and the Company

announced that they had entered into an Agreement and Plan of Merger ("Merger Agreement") pursuant to which Sabra will acquire all of the outstanding shares of CCP in an all-stock transaction (the "Proposed Transaction"). Simultaneous with the subsequent merger, Care Capital Properties, LP, a Delaware limited partnership ("CCP LP"), will be merged with and into Sabra Health Care Limited Partnership, a Delaware limited partnership ("Sabra LP"). If consummated, CCP shareholders will receive 1.123 shares of Sabra common stock for each share of CCP common stock they own ("Merger Consideration"). The Proposed Transaction is valued at approximately $7.4 billion.

3.     On June 12, 2017, defendants issued materially incomplete and misleading disclosures in the Form S-4 Registration Statement (the "Registration Statement") filed with the United States Securities and Exchange Commission ("SEC") in connection with the Proposed Transaction. The Registration Statement is deficient and misleading in that it fails to provide adequate disclosures of all material information related to the Proposed Transaction.

4.     Accordingly, Plaintiff alleges herein that Defendants have breached their fiduciary duties and violated Sections 14(a) and 20(a) of the Exchange Act in connection with the filing of the Registration Statement. Plaintiff seeks to enjoin the stockholder vote on the Proposed Transaction unless and until such Exchange Act violations are cured.

## JURISDICTION AND VENUE

5.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331, pursuant to 15 U.S.C. § 78aa (federal question jurisdiction), as Plaintiff alleges violations of Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder.

6.     The Court has personal jurisdiction over each of the Defendants because each either is a corporation that is incorporated under the laws of, conducts business in and maintains operations in this District or is an individual who either is present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

7.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because: (a) one or

more of the Defendants either resides in or maintains executive offices here; (b) a substantial portion of the transactions and wrongs complained of herein occurred here; and (c) Defendants have received substantial compensation and other transfers of money here by doing business here and engaging in activities having an effect here.

## PARTIES

8.     Plaintiff Gary M. Douglas is, and has been at all relevant times, the owner of shares of CCP common stock.

9.     Defendant Raymond J. Lewis ("Lewis") has served as a director and Chief Executive Officer of CCP since the Company's spin-off from Ventas, Inc., in 2015.

10.     Defendant Douglas Crocker ("Crocker") has served as a director of CCP since 2015. Crocker currently serves as Chairman of the Board of CCP.

11.     Defendant John L. Workman ("Workman") has served as an independent director of CCP since October 2015.

12.     Defendant Jeffrey A. Malehorn ("Malehorn") has served as an independent director of CCP since October 2015.

13.     Defendant Ronal G. Geary ("Geary") has served as an independent director of CCP since October 2015.

14.     Defendant Dale Anne Reiss ("Reiss") has served as an independent director of CCP since October 2015.

15.     Defendant John S. Gates ("Gates") has served as an independent director of CCP since October 2015.

16.     Defendants Lewis, Crocker, Workman, Malehorn, Geary, Reiss, and Gates are collectively referred to herein as the "Board" or the "Individual Defendants."

17.     Defendant CCP is a healthcare real estate investment trust with a diversified portfolio of triple-net leased properties, focused on the post-acute sector. The Company is a Delaware corporation and maintains its principal offices at 191 North Wacker Drive Suite 1200

3

Chicago IL 60606. CCP's common stock is traded on the New York Stock Exchange under the symbol "CCP."

18.     The Individual Defendants and CCP are referred to collectively herein as "Defendants."

## OTHER RELEVANT ENTITIES

19.     Sabra, a Maryland corporation, operates as a self-administered, self-managed real estate investment trust that, through its subsidiaries, owns and invests in real estate serving the healthcare industry. Sabra leases properties to tenants and operators throughout the United States and Canada.

20.     Sabra, PR Sub, LLC ("Merger Sub") is a Delaware corporation, a wholly-owned subsidiary of Parent, and a party to the Merger Agreement.

## CLASS ACTION ALLEGATIONS

21.     Plaintiff brings this action individually and as a class action on behalf of all holders of CCP stock who are being, and will be, harmed by Defendants' actions described herein (the "Class"). Excluded from the Class are Defendants herein and any person, firm, trust, corporation, or other entity related to, controlled by, or affiliated with, any Defendant, including the immediate family members of the Individual Defendant.

22.     This action is properly maintainable as a class action under Federal Rule of Civil Procedure 23.

23.     The Class is so numerous that joinder of all members is impracticable. According to the Preliminary Registration Statement, as of June 8, 2017, CCP had 84,070,531 shares of common stock outstanding. These shares are held by thousands of beneficial holders who are geographically dispersed across the country.

24.     There are questions of law and fact which are common to the Class and which predominate over questions affecting any individual Class member. The common questions include, inter alia, the following:

     (a)     Whether defendants violated Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder;

     (b)     Whether the Individual Defendants have violated Section 20(a) of the Exchange Act; and

     (c)     Whether Plaintiff and the other members of the Class would suffer irreparable harm were the Proposed Transaction consummated.

25.     Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interests adverse to the Class.

26.     Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class.

27.     The prosecution of separate actions by individual members of the Class creates a risk of inconsistent or varying adjudications with respect to individual members of the Class, which could establish incompatible standards of conduct for Defendants.

28.     Plaintiff anticipates that there will be no difficulty in the management of this litigation. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

29.     Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class a whole.

30.     Accordingly, Plaintiff seeks injunctive and other equitable relief on behalf of himself and the Class to prevent the irreparable injury that the Company's stockholders will continue to suffer absent judicial intervention.

## FACTUAL BACKGROUND

**Company Background and Strong Financial Outlook**

31.     CCP is a self-administered, self-managed healthcare real estate investment trust, with a diversified portfolio of skilled nursing facilities and other healthcare assets operated by private regional and local care providers. CCP leases properties to unaffiliated tenants under long-

term triple-net leases, pursuant to which tenants are obligated to pay all property-related expenses. In addition, CCP originates and manages a small portfolio of secured and unsecured loans, made primarily to skilled nursing facility operators and other post-acute care providers. As of March 31, 2017, CCP's portfolio was comprised of 337 properties operated by 39 private regional and local care providers, spread across 36 states and contained a total of approximately 37,000 beds/units. CCP conducts all of its operations through CCP LP and its subsidiaries.

32.     Recently, on May 9, 2017, CCP issued a press release wherein it reported its first quarter results.

33.     The press release stated in pertinent part:

**First Quarter 2017 Financial Results**
Net income attributable to common stockholders for the quarter ended March 31, 2017 was $65 million, or $0.77 per diluted common share, excluding dividends on unvested restricted shares, compared with $30 million, or $0.35 per diluted common share, excluding dividends on unvested restricted shares, for the quarter ended March 31, 2016.

Normalized Funds from Operations ("FFO") for the quarter ended March 31, 2017 was $57 million, or $0.68 per diluted common share. FFO, as defined by the National Association of Real Estate Investment Trusts ("NAREIT"), for the same time period was $57 million, or $0.68 per diluted common share. Normalized FFO and NAREIT FFO for the quarter ended March 31, 2016 were $67 million, or $0.80 per diluted common share, and $64 million, or $0.76 per diluted common share, respectively. The decreases in the first quarter of 2017 compared to the prior year period are attributable primarily to an increase in interest expense resulting from the refinancing of short-term floating rate debt with longer term fixed rate debt during 2016, the impact of dispositions and transitions, restructures and new leases completed during 2016 and the first quarter of 2017, partially offset by acquisitions and contractual rent increases.

**Operating Results**
During the quarter ended March 31, 2017, CCP invested a total of $8 million through acquisitions and redevelopment, at an average yield of 8.1%. In addition, the Company committed $23 million in new loans for redevelopment and working capital.

During the quarter, the Company disposed of nine properties for gross proceeds of $65 million, representing a weighted average cap rate on cash rent of approximately 9.25%. In addition, the Company entered into definitive agreements to sell an

additional 29 properties for gross proceeds of approximately $180 million at an average cap rate on cash rent of 9.6%.

**Subsequent to Quarter End**
In April, CCP completed its previously announced acquisition of six behavioral health hospitals for $379 million at an initial GAAP yield of 8.7%. The Company has an option, exercisable beginning in the fourth quarter of 2018, to purchase one additional building for an amount expected to be approximately $20 million. In addition, the Company is providing the tenant with a line of $50 million to fund future expansions and revenue-generating improvements in the portfolio.

**Balance Sheet and Capital Markets Activities**
At March 31, 2017, the Company had $514 million of available borrowing capacity under its revolver, and its net debt to Adjusted EBITDA was 4.7x, adjusting for the fourth quarter 2016 dividend paid in January 2017. The Company also had approximately $64 million in cash held in an Internal Revenue Code Section 1031 exchange escrow account at March 31, 2017, which was used to fund a portion of the behavioral health hospital acquisition.

The Company's weighted average interest rate as of March 31, 2017 was approximately 3.8%.

**Dividends**
As previously disclosed, CCP paid its fourth quarter 2016 dividend of $0.57 per share in January 2017.

On March 31, 2017, the Company paid a dividend for the first quarter of 2017 in the amount of $0.57 per share to stockholders of record as of March 10, 2017.

34.     These positive financial results show a Company well positioned to enjoy success as a standalone entity. However, despite these strong results, the Individual Defendants caused the Company to enter into the Merger Agreement, pursuant to which the Company will be acquired for inadequate consideration.

**The Sale Process**

35.     In 2015, Ventas, Inc. ("Ventas") completed a spin-off of its skilled nursing facility portfolio into a publicly traded independent REIT called Care Capital Properties. Following the spin-off from Ventas, CCP proceeded to evaluate and consider various opportunities to enhance stockholder value, including strategic transactions and possible business combinations.

36.     In July of 2016, Richard K. Matros ("Matros"), chairman of the board, chief

executive officer and president of Sabra, reached out to Defendant Lewis, chief executive officer of CCP, to request a meeting to explore potential opportunities for the two companies to work together. This meeting, which was encouraged by Defendant Crocker, nonexecutive chairman of the CCP board of directors, occurred on July 18, 2016, and consisted of a general discussion regarding the potential merits of a business combination transaction between Sabra and CCP.

37.     Following the July 18, 2016 meeting, Defendant Lewis and Defendant Crocker discussed exploring, on a preliminary basis, the possibility of a potential business combination transaction with Sabra. To assist in this process, CCP contacted Merrill Lynch, Pierce, Fenner & Smith Incorporated ("BofA Merrill Lynch") and requested that BofA Merrill Lynch prepare a presentation with respect to a potential business combination transaction with Sabra to be presented at a meeting of the CCP board of directors in September 2016.

38.     A second meeting between Defendant Lewis and Matros occurred on August 24, 2016. During the course of this telephonic meeting, Matros and Defendant Lewis discussed their respective preliminary expectations that any business combination between Sabra and CCP would be an all-stock transaction; that Matros would continue in his role as chief executive officer of the combined company; that the headquarters would be Sabra's current headquarters; and that Defendant Lewis would be willing to serve in management or occupy a seat on the board of directors of the combined company.

39.     In September, prior to the September 21, 2016 regularly scheduled meeting of the CCP board of directors, executives of the two companies engaged in high-level discussions and discussed the potential merits of a potential business combination transaction between CCP and Sabra.

40.     On September 21, 2016, the CCP board of directors held a regularly scheduled meeting at which time representatives of BofA Merrill Lynch reviewed the feasibility a potential business combination between CCP and Sabra. Following this review, the Board directed management to suspend discussions at that time regarding a potential business combination transaction with Sabra in order to permit CCP to focus on making further progress with respect to

8

certain business and operational priorities relating to the spinoff from Ventas.

41.     This interruption was short-lived, and discussions between the two entities resumed on or about January 3, 2017, when Matros contacted Defendant Crocker to discuss resuming discussions. A telephone conversation between Matros and Defendant Lewis followed shortly thereafter on January 5, 2017. During this conversation, Defendant Lewis communicated that the governance structure of the combined company would be of great significance to CCP in considering the potential combination and, in that regard, felt that it was important that CCP management, particularly Defendant Lewis, have a role in the management of the combined company.

42.     Throughout the remainder of January, representatives of UBS and BofA Merrill Lynch, and the respective management teams of Sabra and CCP, engaged in discussions regarding the coordination of a due diligence process in connection with a potential business combination transaction. To facilitate this process, the parties exchanged draft nondisclosure agreements, which included mutual nondisclosure provisions and mutual standstill provisions, as well as various provisions providing for a period of time during which each of CCP and Sabra would agree to engage exclusively with each other to conduct further due diligence and negotiate a potential business combination transaction.

43.     On February 8, 2017, during a regularly scheduled meeting of CCP's board of directors, Defendant Lewis provided the CCP board of directors with an update regarding his discussions to date with Matros, and a representatives of BofA Merrill Lynch discussed with the CCP board of directors a potential business combination transaction with Sabra. Throughout these discussions, CCP was considered to be the surviving entity. After reviewing a number of issues relating to a potential business combination, including financing considerations and potential synergies, and after considering the possibility of other potential strategic alternatives, including a sale to a private equity firm, the Board directed management to commence the exchange of confidential financial information with Sabra and authorized Defendant Lewis to inform Sabra that the CCP board of directors expected that any potential business combination transaction would be

structured as a merger of equals pursuant to which holders of shares of CCP common stock would receive a pricing premium.

44.     On February 13, 2017, Sabra and CCP entered into a mutual nondisclosure agreement, dated February 11, 2017.

45.     On February 15, 2017, Sabra and CCP each provided the other with access to its virtual data room. From February 15, 2017 through the beginning of May 2017, Sabra and CCP, together with their respective advisors, conducted their respective diligence reviews of one another, including summary information from an unaudited financial model with respect to projected financial performance of Sabra, which was made available to CCP on February 15, 2017, and summary information from an unaudited financial model with respect to projected financial performance of CCP, which was made available to Sabra on February 26, 2017.

46.     On March 14, 2017, Sabra posted to its virtual data room an unaudited financial model with respect to its projected financial performance for fiscal years ending December 31, 2017 through December 31, 2021 ("Sabra's March 2017 projections"), and on March 20, 2017, CCP posted to its virtual data room an unaudited financial model with respect to its projected financial performance for fiscal years ending December 31, 2017 through December 31, 2020 ("CCP's March 2017 projections"). Both CCP and Sabra prepared two sets of projections. One set included a number of potential future acquisitions of portfolios where the specific portfolio and seller had not yet been identified or where the talks between the company and the potential seller had not yet reached a point that the company believed there was a relatively high degree of likelihood that an agreement would be reached. The other set did not incorporate these potential future acquisitions. Although CCP's management made both sets of projections available to Sabra and CCP's financial advisors, for purposes of evaluating the potential business combination, CCP chose to focus solely on the projections that did not include unidentified acquisitions.

47.     Shortly thereafter, on March 18, 2017, Matros and Defendant Lewis communicated via telephone regarding Sabra's and CCP's respective businesses. As part of these discussions, the two executives spoke regarding the composition of the board of directors for the combined

company, but agreed to defer a specific discussion until the two companies were in a position to have a full, substantive discussion regarding economics and governance matters after both parties had substantially completed their due diligence efforts.

48.     Three day later, on March 21, 2016, the Board held a regularly scheduled meeting to consider the strategic alternative then under consideration. After discussing the status of the potential business combination transaction with Sabra, the Board directed management to continue to conduct due diligence but to defer engaging in discussions with Sabra regarding pricing and other material terms of a potential business combination transaction until CCP had completed a number of pending acquisitions, as the Board expressed concern regarding the potential impact such acquisitions might have on the trading price of CCP's common stock and the views of investors.

49.     On April 6, 2017, Sabra updated its Sabra's March 2017 projections (the "Sabra April 6, 2017 projections").

50.     On April 10, 2017, CCP announced that it had entered into a definitive agreement to acquire six behavioral health hospitals in a sale-leaseback transaction for $400 million and to fund up to $50 million in capital expenditures to finance expansion and improvements in the portfolio.

51.     Discussions between the parties, and their respective representatives, continued throughout March and early April, and on April 12, 2017, the Board held a meeting to review the status of negotiations with Sabra. During this meeting, Defendant Lewis informed the Board that while discussions regarding exchange ratio and governance had generally been deferred, Sabra had indicated previously that it believed it would be the acquiring entity in any combination and that it would have a greater representation on the combined company's board and management team. Following this discussion, the Board reviewed disclosures provided by BofA Merrill Lynch and determined that, based on the information provided to the CCP board of directors, there were no conflicts that would prevent BofA Merrill Lynch from providing independent advice and an independent fairness opinion to CCP.

11

52.     After considering the disclosures made and determining that BofA Merrill Lynch was qualified to serve as its financial advisor, the Board approved the engagement of BofA Merrill Lynch to serve as a financial advisor to CCP. Additionally, the Board determined that in light of the possibility that members of management could serve as management of the combined company, a second fairness opinion from Barclays Capital Inc. ("Barclays") would likely ameliorate any appearance of a conflict. Accordingly, the Board authorized management to enter into discussions with Barclays to serve as a second financial advisor to CCP. Furthermore, due to the fact that Mr. Lewis was likely to have a role in the management of the combined company, the Board determined that Defendant Crocker should participate in the negotiation of the key terms of any potential business combination.

53.     That same day, Matros and Defendant Lewis spoke via telephone to discuss the potential business combination transaction between Sabra and CCP. During this phone call, Defendant Lewis requested that Sabra provide CCP with a written indication of interest outlining Sabra's proposal.

54.     On April 13, 2017, Sabra sent a nonbinding, written indication of interest letter to CCP proposing a merger in which Sabra would be the legal and accounting acquiring entity and CCP stockholders would receive 1.047 shares of Sabra common stock for each share of CCP common stock held by them, thereby resulting in the existing holders of CCP common stock holding approximately 57% of the outstanding common stock of the combined company. The indication of interest also contemplated that at the closing of the merger, the Sabra board of directors would be expanded from five directors to eight directors and three existing CCP directors, one of which would chair one of the Sabra board of directors' three standing committees, would fill the three resulting vacancies, and that the headquarters for the combined company would be Sabra's headquarters location. Finally the letter also proposed that Sabra would be open to offering employment to members of CCP management, including Defendant Lewis, as part of the combined company's management team and that Defendant Lewis would be one of the three CCP directors appointed to the Sabra board of directors.

55.     On April 17, 2016, the Board held a meeting to discuss the indication of interest letter and to review the status of the due diligence efforts and the status and analysis of the potential business combination transaction with Sabra. The Board also discussed other potential strategic alternatives, including a potential transaction involving another industry participant (the "Interested Industry Participant"), who months prior had expressed interest in a potential strategic transaction. The Board ultimately determined not to explore the possibility of a potential transaction involving the Interested Industry Participant based in part on statements from Defendant Lewis indicating that his understanding was that the Interested Industry Participant was currently focused more on its operations than acquisitions.

56.     On April 18, 2017, CCP delivered to Sabra a written response to Sabra's April 13, 2017 indication of interest letter, in which CCP demanded a higher premium, that its directors make up a majority of the board of directors of the combined company, that a CCP director would be chairman of the board of directors of the combined company, and that a CCP director would be the chairman of the audit committee of the combined company. Following further communication between the parties and their respective representatives, the Board proceeded to alter these demands, and on April 19, 2017 communicated its willingness to agree to a deal wherein: (i) a Sabra director would become chairman of the board of the combined company; (ii) the audit committee of the combined company would be co-chaired (with a CCP nominee and a Sabra nominee serving as the co-chairs); (iii) Defendant Crocker would become chairman emeritus of the combined company; (iv) CCP independent directors would represent a majority of the board of the combined company; and (v) a CCP director would become the lead independent director for the combined company.

57.     Negotiations regarding the above referenced terms proceeded rapidly, and on April 23, 2017, Matros and Defendant Crocker spoke by telephone and agreed to recommend to the Sabra board of directors and the CCP board of directors, respectively, the following proposal: (i) a fixed exchange ratio of 1.123 shares of Sabra common stock per share of CCP common stock, which ratio was determined in order to provide a 15% premium to CCP's stockholders based on

the closing prices of the common stock of each of Sabra and CCP on April 21, 2017, the last trading day before this discussion: (ii) a combined company board of directors consisting of eight members, including three former CCP directors and (iii) a mutual termination fee equal to 1.5% of the equity value of the transaction.

58.     With this framework in place, CCP and Sabra, and their respective representatives continued to proceed with due diligence and negotiate key terms of the merger. On April 28, 2017 posted to its virtual data room an unaudited financial model with respect to its projected financial performance for fiscal years ending December 31, 2017 through December 31, 2021, which had been updated as compared to the Sabra April 6, 2017 projections (the "Sabra April 28, 2017 projections"). On April 29, 2017, CCP followed suit and posted to its virtual data room an unaudited financial model with respect to its projected financial performance for fiscal years ending December 31, 2017 through December 31, 2020, which had been updated as compared to the CCP March 2017 projections (the "CCP April 2017 projections"). The CCP April 2017 Projections reflected: (i) the actual consolidated financial results of CCP and its subsidiaries for the quarter ended March 31, 2017, (ii) the acquisition by CCP of a portfolio of six behavioral health hospitals, and (iii) additional proposed dispositions by CCP of $175 million.

59.     Shortly thereafter, on May 1, 2017, Matros met with the CCP board of directors and discussed Sabra's vision for the combined company. Over the next several days, Sabra and CCP, and their respective representatives, continued to engage in confirmatory due diligence and exchanged drafts of, and finalized, the merger agreement and other ancillary documents.

60.     On May 5, 2017, CCP and Barclays formally entered into an engagement letter with respect to Barclays' engagement as a financial advisor to CCP. The following day, CCP and BofA Merrill Lynch formally entered into an engagement letter with respect to BofA Merrill Lynch's engagement as a financial advisor to CCP

61.     On May 7, 2017, the Board met to discuss the terms of proposed business combination transaction. During this meeting, Barclays and BofA Merrill Lynch delivered their respective fairness opinions, Defendant Lewis described the previously discussed proposed

retention plan for CCP's non-executive employees and potential change in control payments for CCP's executive officers, and, following discussions with financial and legal advisors and members of CCP's senior management, the Board voted to approve the Merger.

62. Later that same day, following the meeting, Sabra, Sabra LP, Merger Sub, CCP, and CCP LP executed the merger agreement. Promptly thereafter, the parties issued a joint press release announcing the merger.

**The Proposed Transaction**

63. In a joint press release dated May 7, 2017, CCP and Sabra announced that they had entered into the Merger Agreement pursuant to which the two companies will combine in an all-stock merger to create a premier healthcare REIT. The combined company is expected to have a pro forma total market capitalization of approximately $7.4 billion and an equity market capitalization of approximately $4.3 billion.

64. The press release states in pertinent part:

IRVINE, Calif. and CHICAGO, Illinois, May 7, 2017 (GLOBE NEWSWIRE) – Sabra Health Care REIT, Inc. (Nasdaq: SBRA, Nasdaq: SBRAP) and Care Capital Properties, Inc. (NYSE: CCP) announced today that they have entered into a definitive agreement pursuant to which the two companies will combine in an all-stock merger to create a premier healthcare REIT. The combined company is expected to have a pro forma total market capitalization of approximately $7.4 billion and an equity market capitalization of approximately $4.3 billion.

Under the terms of the agreement, CCP shareholders will receive 1.123 shares of Sabra common stock for each share of CCP common stock they own. Upon closing of the merger, Sabra shareholders are expected to own approximately 41% and the former CCP shareholders are expected to own approximately 59% of the combined company. The merger is subject to customary closing conditions, including receipt of the approval of both Sabra and CCP shareholders. The parties currently expect the transaction to close during the third quarter of 2017. The all-stock merger is intended to be a tax-free transaction.

**TRANSACTION HIGHLIGHTS**

The merger of Sabra and CCP creates significant financial and operational benefits:

- **Creates a premier healthcare REIT:** The merger brings together two high quality companies with complementary properties creating a unique

15

healthcare portfolio of 564 investments. The combined company will have 70 high quality relationships across 43 states and Canada, creating enhanced growth opportunities to strategically partner with top operators

- **Increased diversification and scale:** The combination of Sabra's and CCP's portfolios will significantly improve both REITs' tenant diversification by operator, geography and asset type. No one tenant will represent more than 11% of the annualized net operating income of the combined company after giving effect to Sabra's previously announced Genesis dispositions and CCP's previously announced closing on the behavioral hospitals.

- **Outstanding credit metrics and cost of capital advantage:** The combined company expects to have modest leverage, excellent liquidity and strong fixed charge coverage, with pro forma investment grade credit metrics. Sabra and CCP believe the greater scale will promote investor interest and increased shareholder liquidity, positioning the combined company to benefit from a more attractive cost of capital, allowing it to successfully compete for future investment opportunities.

- **Immediately accretive:** The merger is expected to generate annual cost savings of approximately $20 million. The transaction is expected to be immediately accretive to Sabra's FFO and AFFO per share and provide the combined company with an attractive earnings growth profile. CCP shareholders will gain immediate benefits through the exchange ratio and improved opportunity for superior shareholder returns through increased growth in the combined company.

- **Poised for growth and value creation:** The transaction adds to both REITs' stable asset bases, and positions the combined company to create a balanced portfolio in the assisted living, independent living and skilled nursing facility asset classes. The more extensive asset base gives the combined company additional flexibility to recycle capital and actively manage the portfolio without sacrificing earnings growth.

- **Attractive dividend:** On a combined basis the dividend will be well covered and be an important and attractive part of the overall shareholder return.

Rick Matros, CEO and Chairman of Sabra stated: "We are excited to announce this transformative transaction that brings together two highly complementary portfolios in a merger we believe to have considerable benefits for all stakeholders. We have reshaped, diversified and enhanced the Sabra portfolio and this transaction represents a logical and substantial next step on that journey. Our balance sheet and access to capital will enable us to continue investing in senior housing assets to balance our portfolio mix, as we did after our spin-off. The increased scale and portfolio diversification, strengthened balance sheet and earnings profile delivered through the merger position us to capitalize on the opportunity set in front of us in an industry that continues to have attractive fundamentals."

Raymond Lewis, CEO of CCP stated: "This is an outstanding outcome for the shareholders of both companies. Since becoming a public company in August of 2015, CCP has worked hard to reposition our portfolio for success and growth with strategic operators. The combined company will have a diversified portfolio of quality operators and assets, with strong free cash flow, a rock solid balance sheet and a highly competitive cost of capital. This solid foundation will enable it to compete and win in the dynamic and growing healthcare real estate market. Rick and his team have a strong track record of delivering on their commitments and producing results and I look forward to supporting them as they continue with this exciting next step."

**LEADERSHIP AND ORGANIZATION**
The current management team of Sabra will lead the combined company, with Rick Matros to serve as Chairman and CEO, Harold Andrews as CFO and Talya Nevo-Hacohen as CIO. The Sabra Board of Directors will be expanded to 8 members, adding CCP's current CEO Raymond Lewis and two additional directors from CCP. Upon completion of the merger, the company will operate under the Sabra name and its common stock will be listed under the ticker symbol SBRA (NASDAQ). The company will be headquartered in Irvine, California.

**The Registration Statement Contains Numerous Material Misstatements or Omissions**

65.     On June 15, 2017, Defendants filed, or caused to be filed, a materially incomplete and misleading Registration Statement with the SEC and disseminated it to CCP stockholders. The Registration Statement misrepresents or omits material information that is necessary for the Company's stockholders to make an informed decision whether to vote in favor of the Proposed Transaction.

66.     Specifically, as set forth below, the Registration Statement fails to provide Company stockholders with material information or provides them with materially misleading information concerning: (i) the valuation analyses prepared by Barclays and BofA Merrill Lynch in connection with the rendering of its fairness opinion; and (ii) the Company's and Sabra's financial projections. Accordingly, CCP stockholders are being asked to vote for the Proposed Transaction without all material information at their disposal.

*Material Omissions Concerning Sabra's and CCP's Financial Projections*

67.     The Registration Statement fails to disclose material information concerning the

financial projections for both the Company and Sabra that were relied upon by the Board and the Company's financial advisors in recommending the Proposed Transaction to CCP stockholders.

68.     Here the Registration Statement provides two sets of projected financial information for CCP, with one set incorporating CCP's "unidentified acquisitions," and the other excluding CCP's "unidentified acquisitions." However, with regard to both sets of projections, the projected financial information for CCP is limited to four non-GAAP accounting metrics for projected financial information over the years 2017-2020: Total CCP Net Operating Income and Other Income, CCP Adjusted EBITDA, CCP Normalized Funds From Operations, and Normalized Funds Available For Distribution. Although the Registration Statement describes the various adjustments that were made to these non-GAAP measures, it fails to disclose the line item projections for the adjustments, or otherwise reconcile these non-GAAP projections to the most comparable GAAP measure for each.

69.     Similarly, with regard to Sabra, the Registration Statement provides two sets of projections, with one set incorporating Sabra's "unidentified acquisitions," and the other excluding Sabra's "unidentified acquisitions." These projections include the non-GAAP financial metrics Sabra NOI, Sabra Adjusted EBITDA, Sabra Normalized FFO, and Normalized AFFO. Although the Registration Statement describes the various adjustments that were made to these non-GAAP measures, it fails to disclose the line item projections for the adjustments, or otherwise reconcile these non-GAAP projections to the most comparable GAAP measure for each.

70.     Furthermore, the Registration Statement also discloses financial projections for the combined company, which includes the non-GAAP financial metric Adjusted EBITDA. However, the Registration Statement fails to provide the line item projections for the metrics used to calculated Adjusted EBITDA or otherwise reconcile Adjusted EBITDA to its most comparable GAAP measure.

71.     Finally, Barclays and BofA Merrill Lynch each calculated unlevered free cash flows for both CCP and Sabra, and proceeded to utilize these resulting values in performing a *Discounted Cash Flow Analysis,* which was presented to the Board, and elsewhere in the

Registration Statement. Although the Registration Statement describes the various adjustments that were made to this non-GAAP measure, it fails to disclose the line item projections for the adjustments, or otherwise reconcile this non-GAAP projections to the most comparable GAAP measure for each.

72.     Providing these non-GAAP metrics without disclosing the line item metrics used to calculate them, or otherwise reconciling the non-GAAP projections to GAAP measures, makes the provided disclosures materially incomplete and misleading.  Non-GAAP measures have no universally understood definition and vary widely between companies depending on the needs of management in promoting their own effect on Company performance.  Rather than disclose the information necessary to reconcile these measures, Defendants chose to omit this information.

73.     Consequently, the Registration Statement provides CCP stockholders with a number of non-GAAP financial projections that make it extremely difficult for stockholders to assess the fairness of the Proposed Transaction. This is particularly problematic for CCP stockholders. Because of the non-standardized and potentially manipulative nature of non-GAAP measures, the SEC requires the disclosure of certain information in solicitation materials. Thus, when a company discloses information in a Recommendation Statement that includes non-GAAP financial measures, as is the case here, the Company must also disclose comparable GAAP measures and a quantitative reconciliation of forward-looking information. 17 C.F.R. § 244.100. Item 10(e)(1)(i)(B) of SEC Regulation S-K further states that, with regard to forward-looking information such as financial projections, *any* reconciling metrics that are available without unreasonable efforts must be disclosed.  17 C.F.R. 229.10(e)(1)(i)(B).  Consequently, without disclosure of these reconciling metrics, the Recommendation Statement violates SEC regulations and materially misleads CCP stockholders.

***Material Omissions Concerning Barclays' and BofA Merrill Lynch's Financial Analyses***

74.     The Registration Statement describes Barclays' and BofA Merrill Lynch's respective fairness opinion and the various valuation analyses it performed in support of their opinions.  However, the description of Barclays and BofA Merrill Lynch's fairness opinion and

the underlying analyses fails to include key inputs and assumptions underlying these analyses. Without this information, as described below, CCP public stockholders are unable to fully understand these analyses and, thus, are unable to determine what weight, if any, to place on either Barclays' and BofA Merrill Lynch's fairness opinion in determining whether to vote in favor of the Proposed Transaction. This omitted information, if disclosed, would significantly alter the total mix of information available to CCP stockholders.

75. Specifically, the Registration Statement fails to disclose various material elements of the financial analyses performed by Barclays and BofA Merrill Lynch. For example, Barclays and BofA Merrill Lynch each performed a *Selected Public Companies Analysis*, which was presented to the Board, yet the Registration Statement fails to disclose the individual multiples and financial metrics for the companies identified in Barclays' and BofA Merrill Lynch's respective analyses.

76. Similarly, Barclays performed a *Selected Precedent Portfolio Transaction Analysis,* which was also presented to the Board, however, the Registration Statement fails to disclose the individual multiples and financial metrics for the transactions observed by Barclays. Interestingly, BofA Merrill Lynch did not conduct a similar analysis, and the Registration Statement fails to disclose the basis for this decision.

77. Furthermore, Barclays and BofA Merrill Lynch each performed a *Discounted Cash Flow Analysis,* which was also presented to the Board. With regard to Barclays' and BofA Merrill Lynch's respective analyses, the Registration Statement fails to disclose (i) the estimated future unlevered free cash flows of the Company used by Barclays and BofA Merrill Lynch in their respective analysis; (ii) the constituent line items Barclays and BofA Merrill Lynch used in calculating unlevered free cash flow; (iii) the estimated terminal value of the Company as calculated by Barclays and BofA Merrill Lynch; and (iv) the inputs and assumptions underlying the discount rate range of 7.5% to 8.5%.

78. Finally, with regard to both Barclays' and BofA Merrill Lynch's respective fairness opinion and the various valuation analyses each company performed in support of their opinions,

20

both advisors used the CCP April 2017 projections, but chose to exclude a number of unidentified transactions and unidentified dispositions. As noted in the section titled "Certain Unaudited Projections," the exclusion of these unidentified transactions and unidentified dispositions had an outsized impact on the financial projections prepared by CCP management. Accordingly, the failure of Barclays and BofA Merrill Lynch to incorporate this information into its analysis renders its financial opinion incomplete, and denies CCP shareholders the opportunity to accurately evaluate for themselves the financial analyses performed by Barclays and BofA Merrill Lynch. Furthermore, the failure to provide an analysis incorporating these transactions is made all the more troubling by the fact that UBS, Sabra's financial advisor, included these transactions as part of its own analyses.

79.    When a bankers' endorsement of the fairness of a transaction is touted to shareholders, the valuation methods used to arrive at that opinion as well as the key inputs and range of ultimate values generated by those analyses must also be fairly disclosed. Furthermore, the disclosure of projected financial information provides stockholders with a basis to project the future financial performance of a company, and allows stockholders to better understand the financial analyses performed by the company's financial advisor in support of its fairness opinion. This information is therefore material, and must be disclosed if CCP stockholders are to make a fully informed decision.

80.    Without such undisclosed information, CCP stockholders cannot evaluate for themselves whether the financial analyses performed by Barclays and BofA Merrill Lynch were based on reliable inputs and assumptions or whether they were prepared with an eye toward ensuring that a positive fairness opinion could be rendered in connection with the Proposed Transaction.  In other words, full disclosure of the omissions identified above is required in order to ensure that stockholders can fully evaluate the extent to which Barclays' and BofA Merrill Lynch's opinion and analyses should factor into their decision whether to vote in favor of or against the Proposed Transaction.

81.    The omission of this information renders certain portions of the Registration

21

Statement false and/or materially misleading in contravention of the Exchange Act including, *inter alia*, the following sections of the Registration Statement: (i) "Opinion of CCP's Financial Advisor, Merrill Lynch, Pierce, Fenner & Smith Incorporated"; and (ii) "Opinion of CCP's Financial Advisor, Barclays Capital Inc."

82. Based on the foregoing, CCP public shareholders lack critical information necessary to evaluate whether the Proposed Transaction truly maximizes shareholder value and serves their interests. Moreover, without the key financial information and related disclosures, CCP public shareholders cannot gauge the accuracy and reliability of the financial analyses performed by Barclays and BofA Merrill Lynch, and whether they can reasonably rely on their respective fairness opinions.

83. Accordingly, Plaintiff seeks, among other things, the following relief: (i) enjoinment of the Proposed Transaction; or (ii) rescission of the Proposed Transaction in the event that it is consummated and to recover damages resulting from Defendants' misconduct.

## FIRST CAUSE OF ACTION
### Against All Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9 Promulgated Thereunder

84. Plaintiff repeats and realleges each allegation set forth herein.

85. As detailed herein, Defendants disseminated the false and misleading Registration Statement specified above, which contained statements which, at the time and in the light of the circumstances under which they were made, were false and misleading with respect to material facts and which omitted to state material facts necessary in order to make the statements therein not false or misleading or necessary to correct earlier statements which had become false or misleading, in violation of Section 14(a) of the Exchange Act and SEC Rules promulgated thereunder, including SEC Rule 14a-9.

86. By the use of the mails and by means and instrumentalities of interstate commerce and the facility of a national securities exchange, Defendants solicited and permitted the use of their names to solicit proxies or consents or authorizations in respect of the common stock of CCP.

87. By virtue of their positions within the Company, the Individual Defendants were

aware of this information and of their duty to disclose this information in the Registration Statement. The Registration Statement was prepared, reviewed, and/or disseminated by Defendants. The Registration Statement misrepresented and omitted material facts, including material information about the unfair sale process for the Company, the unfair consideration offered in the Proposed Transaction, and the actual intrinsic value of the Company's assets. Defendants were at least negligent in filing and disseminating the Registration Statement with these materially false and misleading statements and omissions. Defendants have also failed to correct the Registration Statement and the failure to update and correct false statements is also a violation of Section 14 of the Exchange Act and SEC Rules promulgated thereunder.

88. The omissions and false and misleading statements in the Registration Statement are material in that a reasonable stockholder would consider them important in deciding whether to vote in favor of and tender their shares in the Proposed Transaction. A reasonable investor would view a full and accurate disclosure as significantly altering the "total mix" of information made available in the Registration Statement and in other information reasonably available to stockholders.

89. Plaintiff has no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from immediate and irreparable injury, which defendants' actions threaten to inflict.

<u>**SECOND CAUSE OF ACTION**</u>
**Against the Individual Defendants for Violation of Section 20(a) of the Exchange Act**

90. Plaintiff repeats and realleges each allegation set forth herein.

91. The Individual Defendants acted as controlling persons of CCP within the meaning of Section 20(a) of the Exchange Act, as alleged herein. By virtue of their positions as officers and directors of CCP and their participation in and awareness of the Company's business and operations and their intimate knowledge of the materially false statements and omissions contained in the Registration Statement filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including

the content and dissemination of the various statements that Plaintiff contends are false and misleading.

92.     Each of the Individual Defendants was provided with or had unlimited access to copies of the Registration Statement and other statements alleged by Plaintiff to be false and misleading prior to or shortly after these statements were issued and had the ability to prevent the issuance of the statements or to cause the statements to be corrected.

93.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same. Among other things, the Registration Statement at issue contains the unanimous recommendation of the Individual Defendants to approve the Proposed Transaction. Thus, they were directly involved in the making of that document.

94.     In addition, as the Registration Statement sets forth at length, and as described herein, the Individual Defendants were each involved in negotiating, reviewing, and approving the Proposed Transaction. The Registration Statement purports to describe the various issues and information that they reviewed and considered – descriptions which had input from the Individual Defendants.

95.     By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

96.     Plaintiff has no adequate remedy at law.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment and preliminary and permanent relief, including injunctive relief, in Plaintiff's favor and in favor of the Class and against Defendants as follows:

A.     Certifying this case as a class action on behalf of the Class defined above, appointing Plaintiff as a representative of the Class, and appointing his counsel as class

counsel;

B.      Enjoining Defendants, their agents, counsel, employees, and all persons

acting in concert with them from consummating the Proposed Transaction, unless and until

the Company adopts and implements a procedure or process to obtain the best available

terms for shareholders;

C.      Rescinding, to the extent already implemented, the Proposed Transaction or

any of the terms thereof, or granting Plaintiff and the Class rescissory damages;

D.      Directing the Individual Defendants to account to Plaintiff and the Class for

all damages suffered as a result of the wrongdoing;

E.      Awarding Plaintiff and the Class the costs and disbursements of this action,

including reasonable attorneys' and experts' fees; and

F.      Granting such other and further equitable relief as this Court may deem just

and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury for all issues so triable.


Dated:  June 30, 2017                                   GARY DOUGLAS

                                                        /s/  Vincent L. DiTommaso
                                                        One of his Attorneys


Elizabeth K. Tripodi                           Vincent L. DiTommaso
LEVI & KORSINSKY LLP                           DITOMMASO LUBIN AUSTERMUEHLE, P.C.
1101 30th Street, NW                           17W220 22nd Street, Suite 410
Suite 115                                      Oakbrook Terrace, IL  60181
Washington, D.C.                               (630) 333-0000
(292) 524-4291                                 (630) 333-0333 (Fax)
Etripodi@zlk.com                               vdt@ditommasolaw.com